STATE OF CONNECTICUT *v.* JUDSON BROWN
(11751)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued November 13, 1985—decision released March 4, 1986

*John R. Williams,* with whom was *Jon L. Schoenhorn,* for the appellant (defendant).

*Kevin J. Gumpper,* special assistant state's attorney, with whom were *Carl Schuman,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, and *Mary Galvin,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant[1] Judson Brown was charged in a substitute information with arson in the second degree in violation of General Statutes (Rev. to 1977) § 53a-112 (a),[2] conspiracy in violation of Gen-

---

[1] The defendant was tried and convicted under the name of James Holmes. His true name is Judson Brown.

[2] General Statutes (Rev. to 1977) § 53a-112 (a) provides: "Sec. 53a-112. ARSON IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of arson in the second degree when he starts a fire or causes an explosion: (1) With intent to destroy or damage a building (A) of another, or (B) whether

eral Statutes § 53a-48,[3] and attempted larceny in the first degree in violation of General Statutes (Rev. to 1977) § 53a-122 (a) (2),[4] and General Statutes §§ 53a-49[5]

his own or another's, to collect insurance for such loss; and (2) such act subjects another person to a substantial risk of bodily injury or another building to a substantial risk of destruction or damage."

[3] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[4] General Statutes (Rev. to 1977) § 53a-122 (a) (2) provides: "Sec. 53a-122. LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when . . . (2) the value of the property or service exceeds two thousand dollars."

[5] "[General Statutes] Sec. 53a-49. CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such posses-

and 53a-8.[6] A jury convicted the defendant on all three counts and he was sentenced by the trial court to an effective sentence of imprisonment aggregating not less than eleven nor more than twenty-five years.

The defendant has appealed claiming: (1) that the evidence was insufficient to prove his guilt beyond a reasonable doubt; (2) that the trial court erred in certain rulings on evidence; (3) that the trial court erred in several respects in its instructions to the jury; (4) that he was denied a fair trial because of the trial court's behavior toward the only defense witness; and (5) that he was denied effective assistance of counsel. We find no error.

A summary of the facts that the jury could reasonably have found proven is necessary to review the defendant's claims. On October 7, 1978, Michael Havelick executed a bill of sale to Ophelia Holmes for a laundromat located on Orange Avenue in West Haven. The purchase price was $3000, the price that Havelick had asked when he advertised the laundromat for sale. The laundromat was located in a building with four other stores all under one roof. The laundromat was not doing well financially, and had been shut down by Havelick sometime in August. Its equipment was old. At the time of the purchase, fire insurance in the amount of $30,000

---

sion, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a), it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[6] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

on the equipment and leasehold fixtures and income interruption insurance paying a maximum of $1000 a month for four months were placed on the property. After an initial payment, the premium was financed. The bill of sale to the laundromat and the insurance were both in the name of Ophelia Holmes, who lived with the defendant. Although Holmes was present at times, it was the defendant who negotiated the purchase of the laundromat and he was originally named as the purchaser in the bill of sale. The name of Holmes was later substituted by the seller at the defendant's request. Similarly, although Holmes was present and ultimately became the insured, it was the defendant who conducted all the business with the agent when insurance coverage was obtained. When the insurance was applied for, the defendant made false representations concerning remodeling to be done and the equipment on the premises. The defendant, who gave the name of "Jerry Holmes," also conferred with the owner concerning leasing the building and, at the owner's suggestion, had a lease drawn. The proposed lease, however, was unacceptable to the owner because Ophelia Holmes was named as the lessee and the owner was under the impression that he had rented the premises to "Jerry Holmes." Also, the owner of the building wanted the lease to specify the hours of operation because, since Ophelia Holmes had taken over, he had received numerous complaints that the laundromat was not open regularly and, when he called Ophelia Holmes to tell her that there were customers waiting, she had responded in a desultory fashion. A written lease was never executed.

At approximately 11:30 a.m. on November 6, 1978, the Allingtown Fire Department responded to a report of an odor of smoke at 215 Orange Avenue in the Allingtown section of West Haven. It was determined by fire officials that the odor was emanating from an

overheated ballast on a fluorescent light fixture at the laundromat. The defendant and Holmes were there when the firemen arrived. The fire marshal ordered the electric power to the laundromat turned off and told the defendant to have the light fixture repaired before turning the power back on.

The fire department personnel left the premises at 12:35 p.m. The defendant and Holmes left together at about the same time and Holmes was seen to lock the front door. After the departure of the firemen, a West Haven police officer observed the defendant in a driveway next to the laundromat carrying a half-filled brown paper grocery bag. During this period, the officer saw Holmes walk by the building twice, both times in opposite directions. The officer was distracted momentarily but then saw the defendant emerge from the driveway without the bag. The officer, at that point, went to lunch. A second witness also saw the defendant in the driveway carrying a brown paper bag and a beer can. The defendant was never seen entering the building. About eight to ten minutes after the officer had gone to lunch he was notified of a second fire at 215 Orange Avenue and ran to the scene.

Fire department personnel responded to the second alarm at 12:49 p.m., fourteen minutes after recall from the first alarm. When they arrived at the laundromat, they found it filled with a heavy black smoke. The front door, the only access to the premises, was locked, and they had to break a glass panel with an axe to gain entry. The firemen noticed that the lights were on although power to the premises had been turned off earlier. Though the fire was quickly extinguished, it caused damage to a three foot by three foot section of the floor and to a portion of a wall and the ceiling. The washers and dryers were slightly discolored, one of the dryers suffered heat damage, and the interior of the premises suffered smoke damage.

Investigation revealed that the source of the fire was a pile of debris behind the dryers consisting of newspapers, a telephone book, rags and wood. Included in the debris was a beverage can. None of this debris had been present when fire department personnel inspected the premises after the first alarm. Firemen testified that at that time the area had been inspected and it was clear. One fireman testified that he had inspected the area behind the dryers and it was "clean, very clean." Chemical analysis revealed traces of diesel fuel or kerosene in the debris and wood chips taken from the floor in the vicinity of the fire. There was expert testimony that the fire had been fueled by a liquid accelerant and had burned rapidly causing an "alligator effect." There was also expert testimony that the fire had been deliberately set.

Two days after the fire, the defendant, using the name "James Holmes," gave a statement to the West Haven police wherein he told them that Ophelia Holmes was the owner of the laundromat and that she had paid $5000 to purchase it and set it up. He also said that fire department personnel on their first visit on November 6 had told him to clean out the debris behind the dryers. Further, he said that he did not know how much insurance was on the laundromat, that the business was doing well and that his wife was making "a little over $1000.00 per month." He also told police that he was married to Ophelia Holmes and that he worked as a private pilot with a plane based at Sikorsky Airport. The police could find no record of the defendant's marriage to Holmes and the defendant had only an expired student pilot's license. The fire took place the day the rent for November was due and the day before the first installment payment on the premium finance agreement for the insurance policy was due.

On November 6, 1978, the day of the fire, a public adjuster, Meyer Biller, who knew the defendant and

had previously done business with him, was retained to adjust the claim for fire damage. He inspected the premises that same day. The insurer was the Maryland Casualty Insurance Company (Maryland Casualty). Subsequently, on December 15, 1978, Ophelia Holmes submitted a sworn proof of loss to the insurer. The proof of loss stated that the actual cash value of the personal property and loss of income was $41,500 and that the insured was making a claim under the policy for $30,497.12. An adjuster for the insurance company characterized the $41,500 figure as "highly excessive" and stated that "there was nowhere near that kind of contents on the premises." An expert hired by the insurance company estimated the fire damage to be $3399.20 "giving the insured the benefit of the doubt in every way." The insurance claim was pursued until sometime in April, 1978, after which the insurance company heard nothing further from either the insured or Meyer Biller. At some point, Maryland Casualty considered the claim abandoned.

I

The defendant first claims that the evidence adduced at trial was insufficient to establish his guilt beyond a reasonable doubt. Each essential element of the crimes charged must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Though the jury may "draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture." *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979). " 'Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot "constitutionally stand," as it is violative of due process under the fourteenth amendment. *Jackson* v. *Virginia,* 443 U.S. 307, 317–18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982).' (Footnote omit-

ted.) *State* v. *Haddad,* 189 Conn. 383, 387–88, 456 A.2d 316 (1983)." *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983).

In this case, while all the evidence was circumstantial, it was sufficient, if believed by the jury, to support a verdict of guilty on all three counts. As this court has stated on numerous occasions, "there is no legal distinction between direct and circumstantial evidence so far as probative [value] is concerned." *State* v. *Haddad,* supra, 390. "It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." *State* v. *Perez,* 183 Conn. 225, 227, 439 A.2d 305 (1981).

Further, " '[c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. *State* v. *Faillace,* 134 Conn. 181, 185, 56 A.2d 167 (1947). It is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. The combination . . . may be proved by circumstantial evidence, that is, by proof of the separate acts of the individuals accused and by proof of circumstances from which the illegal confederation may be inferred. *State* v. *Gerich,* 138 Conn. 292, 297, 83 A.2d 488 [1951].' *State* v. *Holmes,* 160 Conn. 140, 150, 274 A.2d 153 (1970)." *State* v. *Baker,* 195 Conn. 598, 604, 489 A.2d 1041 (1985).

"In reviewing the sufficiency of the evidence this court must construe the evidence in the light most favorable to sustaining the verdict; *State* v. *Ferrell,* 191 Conn. 37, 46, 463 A.2d 573 (1983); and then determine whether the jury 'could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty

beyond a reasonable doubt.' *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978); see *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984)." *State* v. *Cimino,* 194 Conn. 210, 478 A.2d 1005 (1984). " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)].' (Emphasis in original.) *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)." *State* v. *Morrill,* 197 Conn. 507, 512, 498 A.2d 76 (1985). We conclude that the evidence summarized, though circumstantial, was sufficient to support the verdict of the jury.

## II

The defendant next claims that the court erred in excluding evidence tending to show an innocent explanation for the failure of Holmes to bring suit on the insurance claim within one year as required by the policy. At one point in the direct examination of Robert Clark, an insurance adjuster for Maryland Casualty, Clark was asked if the claim resulting from the fire had been pursued and whether his company had ever paid anything on the claim. He testified that his company had not paid anything on the claim, that it had not been pursued after April, 1979, and that it was considered abandoned.

On the direct examination of Meyer Biller, the public adjuster retained by Holmes, the defendant attempted to elicit testimony that Holmes had accused him of negligence in having failed to advise her properly and in having failed to bring suit on the claim

within a year as required by the insurance policy. The defendant claims that such testimony would have provided an innocent explanation for the failure of Holmes to pursue the claim and would have rebutted any inference of consciousness of guilt on her part for her failure to do so. The state objected to the evidence and the trial court sustained the state's objection on grounds of relevancy. The defendant took an exception. The defendant claims that the court's ruling deprived him of due process of law by preventing him from exercising his constitutional right to present a defense. We agree with the defendant that the evidence had some relevance and that the trial court erred in excluding it. We do not agree, however, that a single evidentiary ruling on a minor collateral issue such as consciousness of guilt of a co-conspirator deprived the defendant of his due process right to present a defense. The error, therefore, was not of constitutional dimension. "The issue was the relevancy of the testimony. That is not an issue of constitutional dimension, but rather of the trial court's discretion." *State* v. *Moye,* 177 Conn. 487, 511, 418 A.2d 870 (1979). "Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985).

Though the evidence excluded may have been relevant to rebut a consciousness of guilt on the part of Holmes, its exclusion was nevertheless harmless. The trial court only charged the jury that the defendant's own actions or declarations could be used to show a consciousness of guilt on his part. The jury was never instructed that it could consider Holmes' actions or lack thereof to show a consciousness of guilt on her part. More importantly, a review of the record reveals ample evidence from which the jury could have found Holmes' involvement absent the evidence that she did not pursue the claim under the policy.

The ruling of the trial court in order to constitute reversible error must have been both incorrect and harmful. *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147 (1969). "It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." *State* v. *Vitale,* supra, 403. The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result? *State* v. *Gonzales,* 196 Conn. 115, 119, 491 A.2d 1067 (1985). It did neither.

The defendant also claims error in another evidentiary ruling. This claim may be summarily treated. The defendant argues that the trial court erred in sustaining the state's objection to a question on cross-examination of a fire marshal who had taken a statement from Holmes shortly after the fire. Defense counsel asked, "And then, in the course of the statement you took from Ophelia Holmes, did she admit having insurance coverage on the premises?" The state objected to the question on the ground that it would elicit hearsay. Defense counsel responded, "Well, when I made that objection, Your Honor, it was overruled." The court sustained the objection and defense counsel took an exception. Defense counsel's offer was devoid of any specific reason for admissibility. See Practice Book § 288. On this record, it would be improper to find error. See *State* v. *Rothenberg,* 195 Conn. 253, 262, 487 A.2d 545 (1985). If, however, it is assumed that there was error, it was harmless. There was an abundance of evidence that there was insurance on the premises, that it was in the name of Ophelia Holmes, and that she was present and participated when the application

for the policy was made. The exclusion of the evidence could not reasonably have affected the verdict. See *State* v. *Tropiano,* supra, 427.

## III

The defendant next claims that the trial court erred when it instructed the jury on consciousness of guilt and on conspiracy to commit arson. We are not bound to consider error as to the giving of or the failure to give an instruction unless the matter is covered by a written request to charge or an exception has been taken. Practice Book § 854. Since the defendant did neither, we are not bound to consider the challenges to the trial court's instructions unless "the record adequately supports a claim that [the defendant] has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

The defendant claims that the court's charge on consciousness of guilt permitted the jury to convict him on insufficient evidence, thus depriving him of due process under both the state and federal constitutions and was plain error. In its charge the court stated that any false statements by the defendant subsequent to the crime "often tend to show a guilty connection" rather than "consciousness." It is obvious from the text of the charge that the court either inadvertently misspoke or that there was an error in the transcription. In the same segment of the charge the court also said that, from subsequent false statements of the accused, the jury could fairly infer "guilty knowledge." The defendant appears to argue that the court's charge allowed the jury to consider false exculpatory statements made after the crime as evidence of the defendant's guilt rather than as evidence of consciousness of guilt. Generally, postcrime false exculpatory statements may only be considered by the jury as circumstantial evidence

of consciousness of guilt. *United States* v. *Zang,* 703 F.2d 1186, 1191 (10th Cir. 1982); *United States* v. *Boekelman,* 594 F.2d 1238, 1240 (9th Cir. 1979). Consciousness of guilt may be considered along with other evidence in determining guilt. *United States* v. *Morales,* 577 F.2d 769, 772–73 (2d Cir. 1978).

"On appeal, the adequacy of jury instructions is not determined by the giving of any one instruction, but by examining the instruction as a whole." *United States* v. *Boekelman,* supra. The charge is not to be critically dissected in a search for inexact or inadvertent statements. *State* v. *Harris,* 172 Conn. 223, 226, 374 A.2d 203 (1977). Whether the words "guilty connection" and "guilty knowledge" allowed the jury to consider false exculpatory statements as evidence of guilt itself, rather than as evidence of consciousness of guilt, is debatable. Assuming that they did, we do not attach a talismanic effect to "consciousness" that automatically turns a conviction after trial into a reversal. The defendant complains of three words in a charge that covered fifty-one pages of trial transcript. The jury was otherwise properly instructed and there was substantial other evidence of guilt. See *United States* v. *Boekelman,* supra. Further, the defendant has not in his brief made reference to any particular statements made by him which he claims could have been misused by the jury. Under these circumstances, the record does not bear out the defendant's contention that the court's instruction allowed the jury to convict him on insufficient evidence and therefore does not adequately support a claim that he has been deprived of a fundamental constitutional right and a fair trial. See *State* v. *Evans,* supra. Nor does the defendant's claim warrant review under the plain error doctrine. *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985).

The defendant further claims that the court's charge on the second count of the information, conspiracy to

commit arson, enabled the jury to convict him on evidence which was insufficient as a matter of law and therefore deprived him of due process. His claim appears to be that the court, in reviewing the facts relevant to this count, left the jury with the impression that they could convict the defendant solely by virtue of Holmes' pecuniary interest in the laundromat. We disagree. "The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury." *State* v. *Sumner,* 178 Conn. 163, 170, 422 A.2d 299 (1979). The court's charge on conspiracy to commit arson passed that test.

The defendant also claims that the court erred when it instructed the jury as follows: "It is the sworn duty of the Courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law imputes to every person so charged; but the law is made to protect society and innocent persons and not to protect guilty ones." The defendant argues that the charge diluted the presumption of innocence.

We recently considered a similar instruction in *State* v. *Palmer,* 196 Conn. 157, 168–69, 491 A.2d 1075 (1985), and held that "[e]xamining the questioned instruction both in the context of the portion of the charge in which it was used as well as in the context of the charge as a whole, we see nothing to suggest that the challenged language qualified or diluted the presumption of innocence, or that it might have misled the jury to suppose that the defendant could only invoke the presumption after he had established his innocence." There was no error in this regard.

## IV

The defendant next claims that the trial court denied him his federal and state constitutional rights to a fair trial, an impartial jury, and compulsory process by mak-

ing "disparaging remarks" toward the only defense witness, Meyer Biller. He claims also that the trial court "raised the spectre" that the witness and the defendant were coconspirators when it referred to defense counsel as the witness' attorney.

The issues counsel now raises on appeal were not raised at trial. There was no objection to any remarks made by the trial court to the witness, nor was a motion for a mistrial made or a curative instruction requested. We have nonetheless reviewed the entire transcript of Biller's testimony. We are satisfied that the record does not adequately support a claim that the judge's conduct toward the witness deprived the defendant of a fundamental constitutional right and a fair trial. Therefore, since the defendant's claims were not raised and decided in the trial court, we will not consider them. See *State* v. *Evans,* supra, 69, 70; see also *State* v. *Mack,* 197 Conn. 629, 642, 500 A.2d 1302 (1985).

## V

The defendant's final claim is that he was denied the effective assistance of counsel at his trial. In view of the modification of our procedure in regard to ineffective assistance of counsel claims wrought by the recently decided case of *State* v. *Leecan,* 198 Conn. 517, 542, 504 A.2d 480 (1986), "we shall not review at this time even the portion of the defendant's claim that he contends is adequately supported by the record. Though we have resolved his other claims of error, we believe that his ineffective assistance claims should be resolved not in piecemeal fashion, but as a totality after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify."

There is no error.

In this opinion the other judges concurred.